No. 5.—CHARLES T. BEALE, plaintiff in error, *vs.* BENJAMIN F. HALL, defendant in error.

[1.] Letters of administration granted by the Ordinary to the Clerk of the Superior Court, under the 2d section of the Act of January 20th, 1852, do not cease with the expiration of his term of office as Clerk.

[2.] The pleadings need not aver the grounds upon which an administrator is entitled to the letters, even if the letters express them.

[3.] Evidence that a party conveyed property to defraud his creditors, inadmissible in an action by his administrator to recover the property conveyed, but where there is an absence of proof of creditors, the administrator may offer proof that the intestate was induced to convey by exciting his fears of future embarrassments and was thus made the victim of the fraudulent contrivance of the person to whom the conveyance was made.

[4.] No error, for the Judge of the Superior Court to refuse to allow counsel to withdraw their announcement that they had closed their case, for the purpose of enabling him to examine further a witness, who had been on the stand, in relation to a matter not material to the justice of the case.

[5.] When two sets of letters of administration, on the same estate, to two different persons are in evidence, and the case shows that one of them must have been offered to the Court only on application for an order to substitute a party, and that the other was offered as proof to the jury as the substituted party's authority o sue, and his title, it is no error in the Court to charge the jury, that the latter letters were conclusive evidence of the administrators' authority to sue.

[6.] It is erro for the Court to charge the jury that nothing had been shown to pass titles to slaves except bills of sale, when there was evidence, however slight, on which it might be insisted that there was a second purchase not evidenced by bills of sale.

[7.] It is not error in the Court to refuse to charge the jury that in cases of fraud of both parties, it will leave them where it found them. In the absence of fraud in both parties.

[8.] An instrument of conveyance made to defraud creditors cannot be avoided by the party making it, or his personal representative.

[9.] The Court may direct the correction of the verdict of the jury in matters of form.

[10.] No error for the Court to refuse to allow the jury to be polled.

[11.] New trial refused on the ground taken in the rule, that the verdict was against law, evidence and the preponderance of evidence, but awarded on other grounds.

Trover, in Richmond Superior Court. Tried before Judge HOLT, at October Term, 1856.

This was an action of trover, brought originally by Oswell E. Cashin, administrator of Gazaway Beale, deceased, against Charles T. Beale, for the recovery of three negro slaves, alleged to be the property of the intestate. Cashin was appointed administrator by virtue of his office, (Clerk of the Superior Court,) and at the expiration of his term, the suit was prosecuted by Benjamin F. Hall, who had been appointed administrator *de bonis non*, likewise by virtue of his office.

The facts of the case, and the points decided which arose thereon, will fully and sufficiently appear, from the bill of exceptions and the opinion of the Court.

The following is the bill of exceptions, viz:

STATE OF GEORGIA, ⎫   In the Superior Court, April
Richmond County.  ⎭ Term, 1857.

Charles T. Beale, plaintiff in error, ⎫
              *vs*                    ⎪
Benjamin F. Hall, Administrator of   ⎬ *Bill of Exceptions.*
Gazaway Beale, deceased, defend-     ⎪
ant in error.                        ⎭

*Be it Remembered*, That at the October Term, 1856, of
the Superior Court of Richmond county, there was called,
and came up for trial on appeal, the case of Oswell E. Cash-
in, administrator of Gazaway Beale, deceased, against Charles
T. Beale, being a Common Law action of Trover for the
recovery of three negro slaves, viz: Matt, Buck, and Martha,;
the parties being at issue before a Special Jury, the
Court, on the motion of plaintiff's counsel, and which was
objected to by defendant's counsel, allowed plaintiff to amend
his pleading, by substituting Benjamin F. Hall, administra-
tor, *de bonis non*, of Gazaway Beale, deceased, as the party
plaintiff in the case, in the place of said Oswell E. Cashin,
without *scire facias*, or other notice to the defendant—there
being no motion for a continuance, on account of surprise—
and to which decision of the Court, defendant's counsel ex-
cepted.

In the further progress of said trial, defendant's counsel
excepted to the plaintiff's pleadings, for the reason, that in
the declaration it was not alleged that Oswell E. Cashin was
the administrator of Gazaway Beale, in his character of
Clerk of the Superior Court of Richmond county, which fact
appeared from the letters of administration, put in evidence
by plaintiff.

Further: In the progress of said trial, the plaintiff was al-
lowed to introduce the parol testimony of witnesses Rhodes
and Greenwood, which went to show, that the deeds relied
upon by the defendant, were not what they purported to be,
to-wit: absolute bills of sale, but that they were intended to

protect the property of Gazaway. Beale from the claims of his creditors, to which defendant objected; which objection, as well as a subsequent one, that the Court would rule out and withdraw all such testimony from the consideration of the jury, was overruled by the Court; counsel for defendant excepting.

In the further progress of the trial of said case, defendant's counsel moved the Court to be allowed to recall his announcement that he had closed his case, in order to prove the fact, by the witness Simpson, that, "*at the time defendant paid Gazaway Beale five hundred dollars, both the Beales being present, the defendant asked Simpson, whether the title papers he already had would do ? and Simpson told him they would.*" The application to the Court having been made, on the opening of the Court, the next morning after the announcement, and before the argument on the facts had commenced, counsel for the defendant stating in their place, that they were not aware of the fact sought to be proved until after the announcement was made: which motion was overruled by the Court, and to which defendant's counsel excepted.

Further: In the progress of the trial of said cause, the counsel for defendant requested the Court to charge the jury, that "if they find Benjamin F. Hall, Clerk of the Superior Court, is not the legally appointed administrator of Gazaway Beale, they ought to find for the defendant;" which charge the Court gave, but qualified it by adding thereto the *remark*, that "the letters of administration of said Hall are *conclusive* evidence of the fact of his administration, and establish his right to sue;" to which additional qualification, by the Court, to said charge, so asked, the counsel for defendant excepted.

In the further progress of said trial, the Court charged the jury, that "nothing had been shown to pass the title of the slaves, from Gazaway Beale, except the bills of sale," when counsel for defendant had relied, in their argument before

the jury, upon the facts testified to by witness Simpson, as to showing a sale of the slaves by Gazaway Beale to the defendant, on the day before the blow was received which resulted in the death of Gazaway Beale; and to which charge, the defendant's counsel excepted.

In the further progress of said trial, the counsel for the defendant requested the Court to charge the jury that, "if the jury find that the bills of sale made by Gazaway Beale to the defendant, were made in fraud, and if Gazaway Beale was a party to the fraud, they are good *as against the maker* of them, and carry a good title to defendant; and that in cases of fraud, by both parties, the Court will leave them, where it finds them;" Which said last mentioned charge, as asked, the Court refused to give, and in lieu thereof charged the jury, "That the administrator of a decedent represented the distributees and creditors of his estate; and that an instrument which would be void against the creditors of the deceased, would also be void as against the administrator;" (there having been no evidence of any debts due by the estate of such decedent,) and to which refusal of the Court to give such charge, as asked, and the giving of the charge, as made, to the Jury, in lieu of the one asked, the counsel for the defendant excepted.

In the further progress of said trial, the jury returned into Court with a verdict, which the Court refused to receive and have entered on the minutes; but directed and instructed the jury as to the verdict they must find; the papers being handed to the jury, they returned to their room, and shortly afterward returned with a verdict conforming to the directions of the Court, and which was in the words and figures following, to wit:—"We, the jury, find the defendant guilty, and we assess damages for the plaintiff, in the sum of thirty-seven hundred dollars, for the value and hire of the negroes, Buck, Matt, and Martha: of which, one thousand dollars may be discharged by the delivery of the boy Buck, one thousand dollars by the delivery of the boy Matt, and eight

hundred dollars by the delivery of the woman Martha, on the first day of January next, to Benjamin F. Hall, administrator, and on payment of costs by said defendant. " "Porter Fleming, foreman. " The counsel for defendant insisting that the verdict, as originally brought in by the jury, should be received, and that the one last brought in, under the directions of the Court, should not be received—all which was overruled by the Court, and the said latter verdict was ordered by the Court to be entered on the minutes: counsel for defendant excepting. Counsel for defendant, also, further moved the Court, that the jury be polled, which the Court refused, and ordered the verdict recorded; and to which counsel for defendant excepted.

Whereupon, afterwards, and during the said October Term, eighteen hundred and fifty-six, of said Court, the defendant's counsel, before the adjournment of the Court, moved a new trial in said case, on the following grounds, to wit:

1st. Because the verdict was contrary to law, evidence, and the preponderance of evidence.

2d. Because the suit was originally brought in the name of Oswell E. Cashin, administrator of Gazaway Beale, and the Court allowed an amendment of the declaration by making Benjamin F. Hall, administrator *de bonis non*, of Gazaway Beale, the party plaintiff by order of Court, without *scire facias*, or other notice to the defendant.

3d. Because the Court refused to allow the defendant to recall his announcement, that he had closed his case, in order to prove the fact by the witness Simpson, that " at the time defendant paid Gazaway Beale the five hundred dollars, both the Beales being present, the defendant asked Simpson whether the title papers he already had would do;" which application to the Court, was made before the argument upon the facts had commenced: counsel for defendant stating in their place, that they were not aware of the fact until after the announcement was made.

4th. Because the Court admitted parol testimony from the witnesses Rhodes and Greenwood, which went to show that the deeds relied upon by defendant were not what they purported to be—to wit, absolute bills of sale, but that they were intended to protect the property of Gazaway Beale from his creditors; and because the Court subsequently refused, upon the application of the defendant, to rule out and withdraw all such testimony from the consideration of the jury.

5th. Because the Court in charging the jury, as requested by the defendant, that "if the jury find that Benjamin F. Hall, Clerk of the Superior Court, is not the legally appointed administrator of Gazaway Beale, they ought to find for the defendant," added to that charge the *remark,* that "the letters of administration of said Hall are conclusive evidence of the fact of his administration, and establish his right to sue."

6th. Because the Court in his charge to the jury said, that " nothing had been shown to pass the title to the slaves from Gazaway Beale except the bills of sale;" when the counsel for defendant had relied, in their argument before the jury, upon the facts testified to by the witness Simpson, as showing a sale of the slaves by Gazaway Beale to defendant, on the day before the blow was received which resulted in the death of Gazaway Beale.

7th. Because the Court refused to charge the jury, as requested by defendant's counsel, " That if the jury, found that the bills of sale made by Gazaway Beale to the defendant, were made in fraud, and that if Gazaway Beale was a party to the fraud, they were good *as against the maker of them,* and convey a good title to the defendant; and in cases of fraud by both parties, the Court will leave them where it finds them."

8th. Because the Court charged the jury, that the administrator of a decedent represented the distributees and creditors of the estate, and that an instrument which would be void as against the deceased, would also be void as against

the administrator; there being no evidence of any debts due by the estate of such decedent.

9th. Because the jury returned into Court with a verdict in the following words and figures:

" We, the jury, find for the plaintiff as follows:

| | | | | |
|---|---|---|---|---|
| For Bill $1,000, Matt $1,000, Martha $800—making twenty-eight hundred dollars, | - | - | - | $2,800, |
| For the hire of Billy, four years, $150 per year, | - | - | - | - | - | - | $600 00 | |
| For the hire of Matt, same time, $125 per year, | - | - | - | - | - | 500 00 | |
| For the hire of Martha, same time, $75 per year, | - | - | - | - | - | - | 300 00 | |
| | | | $1400 00 | |
| Less by payment by Charles T. Beale, | 500 00 | 900 00 |

Making in the aggregate thirty seven hundred dollars, - - - - - - - $3,700 00

We allow medical attention to balance the interest which may have accrued on the negro hire.

We also find, that Charles T. Beale shall be relieved of the payment of twenty-eight hundred dollars, by the delivery of the before mentioned negroes, Billy, Matt, and Martha, to Benjamin F. Hall, administrator, on the first day of January next." "Porter Fleming, Foreman."

The Court permitted counsel for plaintiff to write out a verdict for the jury, which when read the Court disapproved, and then the Court dictated the verdict, and instructed the jury that they must so find; the papers were returned to the jury, who returned to their room, and shortly afterwards brought in the verdict as dictated by the Court, which the Court ordered to be placed upon the minutes.

To all of which defendant's counsel at the time objected, and insisted that the verdict as originally returned by the jury, should be entered on the minutes, which the Court refused to allow.

10th. Because, the Court refused, upon the application of defendant's counsel, to permit the jury to be polled when the second verdict was rendered.

11th. Because the Court permitted such second verdict, written out by plaintiff's counsel, and returned by the foreman, under the instruction of the Court, as aforesaid, to be entered on the minutes, notwithstanding the objections of defendant's counsel thereto.

12th. Because there was no allegation in the declaration, that Oswell E. Cashin was the administrator of Gazaway Beale, in his character as Clerk of the Superior Court of Richmond county, which fact appeared from his letters of administration, put in evidence by plaintiff.

During the said last October Term of said Superior Court, and before the adjournment thereof, the said grounds for new trial, having been filed, with a brief of the testimony in the case, and the said motion having been argued before the Court, before the adjournment, the Court not having delivered its decision on said motion; it was by consent of parties, with the approval of the Court, ordered that the filing of said grounds and brief should operate as a supersedeas in said cause, till the further order of Court, and that the decision might be rendered and filed during vacation, either party being permitted to except within thirty days after the decision on said motion should be filed. But the decision of the Court not having been made and filed during vacation, but held up till the present Term of said Court, to-wit: April Term, 1857, which commenced on the 13th day of April of the present year, and adjourned on the 16th day of May of the same year, when and during which said Court, to-wit, on the 15th day of April, of said Term, and before the adjournment of said Court, the presiding Judge of said Court delivered a decision on said motion for new trial, overruling the same upon each and all of said grounds.

Whereupon, in open Court, and now here, the defendant, ithin thirty days after the adjournment of said Court, ex-

cepts to the decision of the Court in overruling said motion for a new trial, and says that said ruling and decision was erroneous, and presents this bill of exceptions, and prays that the same may be signed and certified, according to the statute in such case made and provided.

MILLERS & JACKSON,
J. C. SNEAD & SONS,
*Attorneys for Plaintiff in Error.*

Benjamin F. Hall, Adm'r, &c.<br>
   *vs.*     } *Trover.*<br>
  Charles T. Beale.

Copy of the brief of testimony in the case as adduced on the trial, and as agreed between the counsel of the parties, and filed with the grounds for a new trial.

### *Testimony on the part of the plaintiff:*

1. Copy letters administration to Oswell E. Cashin:

STATE OF GEORGIA, } By the Court of Ordinary for said Richmond County. } county.

Whereas, Gazaway Beale, late of Richmond county, deceased, died intestate, having while living and at the time of his death, divers estates, real and personal, within the said State, by means whereof the full disposition and power of the granting of administration of the estate of the deceased, and also a final dismission from the same to the Court aforesaid, does of right belong: And they desiring that the same may be well and duly administered and legally disposed of, do hereby grant unto Oswell E. Cashin, Clerk of the Superior Court of Richmond county, administrator, with full power, by the tenor of these presents, to administer the entire estate, both real and personal, of the said deceased, which to him in his life time, and at the time of his death belonged; and to ask, demand, sue for, recover and receive the same, and pay the debts in which the deceased stood bound, so far forth as his assets will extend, according to law, and then the balance,

if any, to pay over to the legal heirs and distributees of the said deceased.

Witness my hand as Ordinary, and the seal of the said Court, the tenth day of January, eighteen hundred and fifty-three.

LEON P. DUGAS, *Ordinary.*

[SEAL.]

2. Copy letters of administration, *de bonis non*, of Benjamin F. Hall:

STATE OF GEORGIA, } By the Court of Ordinary for said Richmond County. } county.

Whereas, Gazaway Beale, late of the county and State aforesaid, deceased, died intestate, having, while living, and at the time of his death, divers estates, real and personal, within the said State, by means whereof the full disposition and power of the granting the administration of the estate of the said deceased and also the final dismission from the same to the Court aforesaid does of right belong. And they desiring that the same may be well and truly administered, and legally disposed of, do hereby grant unto Benjamin F. Hall, Clerk of the Superior Court for the county aforesaid, administrator, *de bonis non*, full power, by the tenor of these presents, to administer the estate, both real and personal of said deceased, which to him in his life time and at the time of his death did belong, and to ask, demand, sue for, recover and receive the same, and to pay the debts in which the deceased stood bound, so far forth as his assets will extend, according to law, and then the balance if any, to pay over to the legal heirs and distributees of the said deceased.

Witness my hand as Ordinary, and the seal of said Court, this 17th day of April, 1856.

[SEAL.]        FOSTER BLODGET, Jr., *Ordinary.*

3. *Dr. Alexander Martin,* sworn: Knew Gazaway F. Beale, deceased; knew the slaves ten years ago, in possession of deceased.

VOL. XXII 31.

Buck aged about 30 years, worth - - - $1,000

Matt aged 28 or 30 years, " - - - - 1,000

Martha aged about 20 years, " - - - - 800

That he hired Buck, in 1850 or 1851, for $140, from defendant, who said he was the property of deceased.

They went by the name of Gaz. Beale's negroes.

That he gave a note for the hire to defendant, and paid the money to him, he received the note from defendant when he paid it; does not remember that at the time he paid the note, that defendant said he was the agent for Gaz. Beale.

4. *Henry Greenwood*, sworn: Knew Buck and Matt, in the possession of Gaz. Beale, some 7 or 8 years ago.

Buck worth - - - - - - $1,000

Matt " - - - - - - - 900

Has not seen Matt in 5 years, if he is now as he then was, he would be worth $1,000 and Buck would be worth $1,200. Buck's hire from 1852 to this time, would be worth $150, and Matt's about $125 per year.

5. *Richard B. Day*, sworn: Knew Buck and Matt, and afterwards deceased had a woman named Martha. He hired one of the negroes from Gaz. Beale.

Knew them in his possession, (the boys,) about 12 years or a long time. Cannot say how long he had them before his death. Knows nothing of the negroes, after they went to Burke county. Was authorized by the plaintiff Cashin, to demand the negroes. This was in 1852 or '3, before the suit was brought; defendant refused to give them up.

*Cross-Examined.*—He first spoke to counsel, but had not employed any. The negroes were in possession of deceased when he left Columbia county, say two or three years before his death. Does not remember when he died. Defendant said he would not give them up. He might have said "he claimed them," or he might have said, "he had bought them." He demanded the negroes in Augusta, but had no written

authority. When I left Burke county to demand them, I had written authority.

6. *John A. Christian*, sworn: Knew the boys in deceased's life time, and bargained for Buck the Friday before his (deceased) death. On the same day, I saw defendant in relation to the trade, who said there was no incumbrance on him. He hoped I would not buy them, as they were family negroes, and if Gaz. was bent on selling them, that he would buy them himself.

When Gaz spoke to me about the sale, he was drinking.

The negro was in Burke county. Defendant said in the conversation with him, that if he was sold, he would have to make the title to him.

Deceased had been frolicking before his death. Defendant in this conversation, did not in any way deny the right of Gaz. to sell them. He said the title was in him, defendant.

### Testimony for defendant.

1. *Dr. Henry F. Campbell*, sworn: Knows the negroes that he was called upon by the defendant to treat; their names were according to his recollection, Madison and William. Matt is a common abbreviation. Each of them had hernia, which disease impairs the value of a slave one half. This disease is not only of great inconvenience, but may result in loss of life. The hernia in one, had lasted some 8 or 10 months. I think it was some 18 months ago, that they were brought to me for treatment.

2. *Henry Dawson*, witness, examined under commission, to which was annexed the original bill of sale, dated 18th February, 1848, a copy of which is hereto annexed, marked, "*Bill of sale, No.* 1," deposed and answered as follows:

"I know the parties, I reside in Burke county. I drew the annexed bill of sale. Gazaway Beale was in life at the time it was done.

The bill of sale was drawn at my house at night. There was no money paid, nor no notes given that night. Charles T. Beale, asked me if he must give notes that night, or would next day answer. I thought next day would answer.

I have known the slaves named in said bill of sale to be in possession of defendant. They went into his possession from the date of the bill of sale, and remained in his possession to about 1853, at about which time he carried them to Richmond county.

I hired the boy Billy Buck from defendant and gave my note to him for the hire."

*Answers to Cross Interrogatories.*—"The understanding was, that Charles Beale, was to give his note the next day.

There was no money paid at the time. The understanding was that Gazaway F. Beale was to hold the bill of sale till next day, at which time he was to receive the notes, and give it up to Charles T. Beale.

I was called on by both parties to draw the bill of sale: when drawn, delivered the same to Gazaway Beale.

I know nothing more that will benefit the plaintiff."

3. *Augustus R. Roberts*, whose testimony was taken by commission, deposed and answered as follows:

"I know the parties. I knew Gazaway Beale, in his life time. I reside in Burke county.

I was present at the time of a sale of slaves known as Madison and Billy Buck, to defendant. Gazaway F. Beale sold them to him. There was a bill of sale given to Charles T. Beale.

There was neither notes nor money given at the time the bill of sale was drawn. In a conversation, some two or three days afterwards, Gazaway F. Beale, told me he had received the notes for said negroes."

Defendant claimed said slaves as his property while in Burke county, and paid taxes for the same."

*Answers to Cross Interrogatories.*—"The bill of sale was written at Henry Dawson's, February 18, 1848.  Henry Dawson, Charles T. Beale, and Gazaway F. Beale, and the family of Mr. Dawson, were present.

I recollect no conversation but what is stated in the above interrogatory.

The consideration was sixteen hundred dollars.  He wanted to turn the negroes into money, and sold them to Charles T. Beale, for that purpose."

The bill of sale (marked *Bill of sale No.* 1,) was then offered in evidence, and read to the jury.

4. *Elhanan W. Johnson,* and *Hugh Torbet,* whose testimony was taken by Commission, to which was annexed the original bill of sale, dated Sept. 2d, 1851, a copy of which is hereto annexed, marked, " *Bill of sale, No. 2,"* deposed and answered as follows :

" E. W. Johnson, states that he does know the parties.  Dr. Hugh Torbet states that he is acquainted with the defendant.

Both witnesses say that they were acquainted with Gazaway Beale, in his life time, and that they have seen him write, and that they are acquainted with his hand writing.

" E. W. Johnson states that from his knowledge of Gazaway Beale's hand writing, he fully believes the signature in the receipt to be in his own hand; and Hugh Torbet states that he saw Gazaway Beale sign the bill of sale attached.

" E. W. Johnson states that he does not know any thing of the execution of the aforesaid paper.  Hugh Torbet states that he was present when Gazaway Beale executed the above named bill of sale, and delivered it to Charles T. Beale.

" The witnesses both state that they don't know anything more, that will benefit the defendant."

The bill of sale, (copy marked "*Bill of sale No. 2,*) was then offered in evidence and read to the jury.

5. [Bill of Sale No. 1,]

GEORGIA,    } Know all men by these present, That I,
Burke County. } Gazaway F. Beale, of the county and State
aforesaid, for and in consideration of the sum of sixteen hundred dollars, to me in hand paid by Charles T. Beale, of the same place, the receipt of which I do hereby acknowledge, have granted, bargained and sold and by these presents do grant, bargain and sell, unto the said Charles T. Beale, his heirs and assigns, the following property, viz; Two negro men, one by the name of Mat, about twenty three years of age ; and the other by the name of Billy Buck, about twenty-two years of age. To have and to hold the aforesaid bargained negroes, to him the said Charles T. Beale, his heirs and assigns forever.

And I the said Gazaway F. Beale, for myself, my heirs, executors, and administrators, all and singular, the said bargained negroes, unto the said Charles T. Beale, his heirs and assigns, against me, and my said executors and administrators, and against all and any other person and persons whatever, shall and will warrant and defend by these presents.

In witness whereof, I have hereunto set my hand and seal, this eighteenth day of Feburary, one thousand eight hundred and forty-eight.

GAZAWAY F. BEALE, *L. S.*

Signed sealed and delivered in presence of
HENRY DAWSON, *J. P.*

6. For value received I assign the within bill of sale to James M. Simpson.

C. T. BEALE.

Augusta, Nov. 20th, 1852.

7. GEORGIA,    }
Burke County. } *Clerk Office Superior Court.*

Recorded in Record Book deeds, No. 11, folio 238. January 25th, 1854.

EDWARD GARLICK, *Clerk*
*Superior Court B. C.*

8. [Bill of Sale No. 2.]

September 2nd, 1854.

Received of C. T. Beale six hundred dollars, it being in full for the purchase of one negro slave named Martha ; the right and title to said slave I will warrant and defend against the claims of all other person or persons whatever, and likewise warrant her sound.

And witness my hand and seal.

GAZAWAY F. BEALE, [SEAL.]

*James M. Simpson,* sworn: Bill of sale from deceased to defendant shown him. Defendant borrowed some money from him, say $500 or $600, to finish paying for two negroes That he paid deceased the money. Defendant was living with him at the time. This was in 1851 or 1852.

I took a transfer of the bill of sale as security.

Defendant returned me the $500, or whatever sum I loaned, and I returned him the bill of sale.

Gaz. Beale who was present, said he was satisfied, and that defendant had paid him all the money. And said it was for the purchase of the negroes.

Gaz Beale died in two or three days after the transfer to me. He was sober at the time of the transaction. Deceased was knocked in the head on Sunday night. This was the Saturday before.

Does not think the transfer was made to him in Gaz. Beale's presence, and does not remember hearing defendant say that he held the negroes for the benefit of his brother.

About this time, heard defendant say, that Christian wanted to buy one of Gaz's boys ; the object of the conversation, was to borrow money from witness to pay the balance due by defendant to deceased, for the negroes.

In this conversation, defendant spoke of them as Gaz's negroes. Defendant said they were family negroes, and if they were sold, he would buy them himself. At the time the $500 were paid, no notes were surrendered by Charles T. Beale, to Gaz. Beale. Witness saw no notes.

10. *Plaintiff in rebuttal.—Rhodes*, sworn. He knew deceased; did not know the negroes. Had a conversation with defendant, but does not know how many years ago. Many years ago, perhaps ten years. He said he intended to fix Gaz's property. Is distantly related to widow of deceased.

11. *John A. Christian*, recalled by defendant. Gaz Beale died in November, 1852; the conversation I had with him, was the Friday before his death.

12. *Richard B. Day*, recalled by defendant. Beale lived some three days after the blow he received, which resulted in his death.

13. *William Doyle*, sworn for defendant. Swore that deceased died on the 25th of November, 1852, or about that time.

14. *Henry D. Greenwood*, recalled for plaintiff. Defendant told me that he was on his way to see Mr. Dawson to get him to write a bill of sale to secure the property to deceased's wife and children, as deceased was a frolicksome man, and said something about securing it against creditors. Witness told him, he would expose any such transaction. Defendant told him, on his return, he had secured the property.

This was about eight years ago—not immediately preceding the death of Beale.

15. The Almanack was introduced by defendant, which showed that the 20th November, 1852, was Saturday.

16. *Barnard Abrahams*, sworn for defendant: Stated that Gazaway F. Beale was buried on the 26th November, 1852.

MILLERS & JACKSON, and SNEAD & SONS, for plaintiff in error.

JENKINS; and T. CONE, for defendant in error.

*By the Court.*—McDONALD, J. delivering the opinion.

[1.] At the trial of this cause the following order was passed by the Court: "It appearing to the Court that Oswell E. Cashin, plaintiff on the record, was administrator in virtue of his office, as Clerk of the Superior Court of Richmond county, that said Oswell E's term of service has expired and that Benjamin F. Hall is Clerk and *ex-officio* administrator of Gazaway Beale, be, and is hereby made a party plaintiff as such administrator, in lieu of said Oswell E. Cashin, the said Benjamin F. having been by the Ordinary of said county, appointed administrator, *de bonis non*, in virtue of said office of Clerk of the Superior Court of said county, and letters of administration having been issued to him, which are now here to the Court shown."

The order was objected to by counsel for the plaintiff in error· The objection was overruled and the decision of the Court is excepted to. The order shows that the Court below held, that administration in cases like the present, when granted to the person who is Clerk of the Superior Court, expires with his term of office, and that it becomes the duty of the Ordinary to grant letters to his successor. It also expresses the judgment of the Court, that the Clerk of the Superior Court became *ex-officio* administrator of the intestate's estate. These propositions are not sustained by the act of the General Assembly. *Pamp.* '51 & '52., *page* 92. If the office of administrator were made by law appurtenant to the office of Clerk of the Superior Court, the administration would vest in him, in virtue of that office. His commission as Clerk would become his commission as administrator, and there would be no necessity for his appointment by the Ordinary. If the statute had vested in the Clerk of the Superior Court the right only, to the administration on the decedent's estate, to the exclusion of all other persons, then the Ordinary must have made the grant to him. He would have had no discretion. But such is not the statute. It does not vest the administra-

tion in the Clerk, nor does it vest in him an exclusive right to it. It makes it the duty of the Ordinary to vest the administration of the estate in the Clerk of the Superior *or* Inferior Court of the county, *or* in any other person or persons in said county, whom *he shall deem fit and proper* for such administration. The object is to ensure the administration of estates. The Ordinary is required to give thirty days public notice before he grants administration under the act, to the end, no doubt, that persons entitled to it under the law, as kindred or creditors of the deceased person, might apply and take it, if they desire to have it. If there be no application, then the Ordinary exercises his statutable discretion by bestowing it on some fit and proper person of the county. The Clerks are mentioned, not to control the discretion of the Ordinary, but simply as a legislative indication of persons to whom, from their position, it might be safe to commit so important a trust. The administration, when granted, vests in the person to whom it is committed, to be revoked or vacated as ordinary administrations. To hold that the administration, when granted, followed the office, would deprive the Ordinary of the discretion manifestly given him by the act, and by possibility, devolve it on a person destitute of the business or moral qualifications to discharge its duties. The administration granted to Cashin, did not, therefore, abate or expire with the expiration of his term of office, but his office of administrator continues, and is on the same footing of administrations granted in ordinary cases.

[2.] Letters of administration are admissible in evidence to prove title, and authority to sue, and no averment in the pleadings is necessary, of the grounds upon which the administrator became entitled to them. The words " *Clerk of the Superior Court of Richmond County*," in the letters of administration to Oswell E. Cashin, might be rejected as surplusage, and they would be good.

[3.] The evidence of Rhodes and Greenwood, does not prove, nor tend to prove, that the deeds relied upon by the

defendant were not what they purported to be, absolute bills of sale; but the object was no doubt to prove that, absolute bills of sale as they were, they were obtained by the fraud of the defendant. He told one of the witnesses he intended to fix Gaz's property. He said to the other, that he was on his way to Mr. Dawson's to get him to write a bill of sale to secure the property to deceased's wife and children, as deceased was a frolicksome man; and said something about securing it against creditors. Defendant told him on his return, he had secured the property. This was certainly evidence for the consideration of the jury, on the issue of fraud or no fraud, on the part of the defendant—whether it was a contrivance of his own to induce the deceased to convey the negroes absolutely to him. These witnesses do not connect the deceased with a scheme, originating with himself, or concerted with others, to defraud his creditors. If the plaintiff had offered evidence to prove that his intestate had planned a scheme to defraud his creditors, and in execution of it, had conveyed his property, it would have been inadmissible, unquestionably, in this action, but he certainly cannot be precluded from proof that his intestate was circumvented and induced by the defendant to convey his property absolutely to him, under the apprehension that his imprudent course of life might bring upon him pecuniary embarrassments, which would deprive him and his family of the means of support. There is no evidence in the record showing that the intestate was indebted at the time of the conveyance, or that *he* proposed the transfer of the property. The evidence was admissible to enable the jury to determine whether the intestate was the author of a fraud against his creditors, and executed the bill of sale in furtherance of his project, or whether he was the victim of the contrivance of another, who excited his fears and obtained a conveyance of his property without consideration, under the pretext that he would hold it for his benefit or that of his family. If the former, the administrator ought not to recover; if the latter, the defend-

ant should not be allowed to retain the property.   1 *Green-leaf on Ev.* §284; *Logan and others vs. Bond,* 13 *Ga. Rep* 201.

[4.] The refusal of the Court to allow the defendant below to withdraw his announcement that he had closed, is excepted to.   The object was to re-examine the witness Simpson, and to prove that at the time the defendant paid Gazaway Beale five hundred dollars, both Beales being present, the defendant asked Simpson whether the title papers he already had, would do? and Simpson told him they would. This Court has held that the Judges of the Superior Courts have " the discretionary power to relax the rule in regard to the examination of witnesses where justice requires that it should be done; and the judgment of the Court will not be reversed for the relaxation of the rule, or the refusal to relax it, unless the error be gross and palpable." *Walker vs. Walker,* 14 *Ga. Rep.* 250.   Was there gross error, or any error at all in the refusal of the Court to allow this witness to be re-examined, to make that proof?   The witness had been examined.   He testified that the plaintiff in error borrowed $500 or $600 from him, to finish paying for two negroes, and that he (plaintiff in error) paid deceased the money.   Gazaway Beale said he was satisfied, and that plaintiff in error had paid him all the money, and said it was for the purchase of the negroes.   This is what he testified to in regard to Gaz. Beal's statement.   He, about this time, heard the plaintiff in error say that Christian wanted to buy one of Gaz's boys.   The object of the conversation was to borrow money from witness to pay the balance due by the plaintiff in error to the deceased, for the negroes.   The plaintiff spoke of them as Gaz's negroes.   Defendant said they were family negroes, and if they were sold, he would buy them himself.   This conversation took place on Saturday.   On Saturday the money was borrowed and the transfer of the bill of sale was made to witness.   On Saturday the plaintiff in error said that Christian wanted to buy one of Gaz's negroes, and that

they were family negroes, and if they were sold, he *would* buy them himself. And yet the witness says the object of this identical conversation was to borrow money to pay the balance due by the deceased for the negroes. The Court below had a right to infer from this testimony that, if what plaintiff in error said was true, to-wit: that if the negroes were sold he *would* buy them himself, he had not bought them when he wanted to borrow the money ; and that, if he had not bought them, he could not have paid already a part of the purchase money, and that he could not have wanted to borrow money to pay the balance ; and to hold that the evidence was not therefore material. The object of the par ty in wishing to make the additional proof by witness, was to enable him to insist upon it before the jury as an implied admission of the sale of the negroes. The question was not propounded to the deceased, nor does it appear that his attention was particularly called to it, or that he was bound to reply. If he had made no sale, he could not have imagined that he was called on to deny it. He was not appealed to. This kind of evidence ought to be cautiously received, and never, unless the circumstances show that a man of ordinary prudence would have spoken. Before uncontradicted statements in the presence of a party are held to be implied admissions against him and his interests, there should be evidence of direct declarations of that kind which naturally call on him to contradict them. 1 *Greenleaf Ev.* §199. There was, therefore, no error in the refusal of the Court to re-open the case to admit the proposed evidence.

[5.] The counsel for plaintiff in error, requested the Court to charge the jury, that, " if they find Benjamin F. Hall, Clerk of the Superior Court, is not the legally appointed administrator for Gazaway Beale, they ought to find for the defendant," There were *two sets of* letters of administration. The Court below had already decided that the grant to Cashin was vacated by the expiration of the term of his office as Clerk of the Superior Court. It was upon this assumption,

that the Ordinary granted the letters to Hall. It was not the case, then, in the opinion of the presiding Judge, of a second grant of administration during a subsisting good administration. There was no issue before the jury between the two administrators. The letters to Cashin were not offered as evidence *to the jury*, and could not have been, for they were offered by the *plaintiff* not to prove title in Cashin, but were offered as evidence *to the Court* to lay the foundation, or proof of the expiration of his office of Clerk of the Superior Court and the election of Hall, for the order substituting Hall as plaintiff for Cashin in whose name the suit had been instituted. If this were so, the only letters of administration before the jury for their consideration, were the letters granted to Hall, the substituted administrator, and his letters were conclusive of his right to sue—just as conclusive as those of any administrator—and the charge of the Court, in this aspect of the case, was right. If the letters of administration granted to Hall were void on account of the prior grant of administration, which had not been vacated or become null, he had no title, and could not recover, but there must have been evidence of this *before the jury*. The jury have no right to consider evidence submitted to the presiding Judge alone as the foundation of an order deemed by him necessary in the progress of the case.

The judgment of this Court reverses the judgment of the Court below, making Hall the plaintiff in the cause, in lieu of Cashin. The administration of Cashin is good until avoided by judicial sentence. The second grant does not avoid it. If the Ordinary were to grant administration to the wrong party, and were then to commit it to the right, we think the better opinion is that, even in that case, the latter is not a revocation of the prior grant, but that it must be done by judicial sentence. 1 *Wms. on Exrs.* 390-1.

[6.] We think there was evidence before the jury, besides the bills of sale, of the passing of the title to the slaves from Gazaway Beale to the plaintiff in error. It is true, it was

slight, but still it was evidence. The possession of the ne-
groes had passed from Gazway Beale to Charles T. Beale.
The latter was in possession of them in Burke county, and
had paid taxes for them. Simpson testified that he borrow
ed money from him to finish paying for the negroes. That
he paid Gaz. Beale the money, who said that he had paid
him all the money, and that it was for the purchase of the
negroes. This was *some* evidence. What degree of credence
it was entitled to, and whether the force of it was not impair-
ed, and to what extent, by the statements of Charles T. Beale
to the same witness, was a question for the jury.

[7.] The counsel for the plaintiff in error, requested the
Court to charge the jury, " that if they find that the bills of
sale, made by Gazaway Beale to the defendant, were made
in fraud, and if Gazaway Beale was a party to the fraud,
they are good as against the maker of them, and carry a
good title to the defendant, and that in cases of fraud by both
parties, the Court will leave them where it found them."
The Court refused to give this charge, and it committed no
error in refusing it. There is no evidence in the record of a
purpose on the part of Gazaway Beale, to perpetrate a fraud
upon any one. In every case of fraud, there must be a per-
son to be defrauded, and a subject in respect to which the
fraud is to be committed. It cannot be contended that Gaz-
away Beale intended to perpetrate a fraud on Charles T.
Beale, by conveying to him valuable negroes, without con-
sideration. He was not the party to be defrauded. If both
parties contemplated a fraud, it must have been contemplated
against some one, or a class of persons, as creditors. There
was no evidence that Gazaway Beale had creditors prior or
subsequent to the transfer of the property, the payment of
of whose claims he had manifested a desire to avoid. It was
not possible, therefore, that he could have meditated a fraud
against creditors. The charge as given, was unnecessary and
uncalled for by the facts in proof; but it was certainly errone-
ous as a principle of law, and inasmuch as the case must go

back for a new trial, it is proper that we should pass upon it, as the testimony on a future trial may be different. If a party conveys property for the purpose of defrauding creditors, which purpose is to be established by proof sufficient to establish the fraudulent intention, the creditors may avoid the conveyance, but the fraudulent party or his personal representative never can.

[8.] Although the party may die, and the administrator on his estate represents creditors as well as distributees, he can no more move to avoid the deed than the party himself could, were he in life. The creditors may move in the matter, but no one else. In such cases the administrator is estopped by the fraudulent act of his intestate.

[9.] There was no error in the instruction of the Court to the jury, to correct their verdict, and put it in proper form. They were not directed to alter it in matter of substance, nor did they do it.

[10.] It was discretionary with the presiding Judge to allow the jury to be polled, or not. He refused it in this case. Nothing appears in the record, (if this Court considered itself at liberty to control the discretion of the Court in this case,) to show that it was improperly exercised.

[11.] A motion for a new trial was made in the Court below, on all the grounds and points upon which we have passed our judgment above, and on the additional ground, that the verdict of the jury was contrary to law, evidence, and the preponderance of evidence. The motion was refused on all the grounds. The last alone, remains to be considered. We know of no principle of law, to which the facts in proof were applicable, violated by the finding of the jury. It was insisted on the trial of the cause, that the negroes were conveyed in fraud of creditors, and yet there is no proof that the maker of the bills of sale was indebted to any considerable amount, or at all, at the time of their execution, or afterwards. Charles T. Beale said something about securing the property against creditors, but Gazaway Beale was not present, and

there is a total absence of proof that there were creditors who were never paid. But Charles T. Beale said he intended to secure the property to deceased's wife and children, as deceased was a frolicksome man. If existing creditors had been provided for in an instrument drawn for that purpose, I will say that there might have been no legal objection to it. But instead of securing it to deceased's wife and children, the bill of sale was made to himself. The jury were certainly at liberty to infer from this proof, that Gazaway Beale did not contemplate a fraud upon his creditors, especially as no debts were proven to have existed at that time; and they were equally at liberty to infer, that Charles T. Beale, by suggesting that his habits might lead to future embarrassments, induced Gazaway Beale to make the bill of sale to him. There could have been no fraud in Gazaway Beale, if he had no creditors to defraud; there could have been no fraud on the part of Charles T. Beale against the creditors of Gazaway Beale, if he had none. Hence, if there were no creditors, there was no violation of the rights of creditors; and the finding of the jury, if they believed there were no creditors, that the administrator might recover the negroes, and was not estopped by any proof before them of a meditated fraud upon creditors, was not a violation of the principle of law, enforced in favor of creditors—that as between parties equally at fault in an illegal transaction, the condition of the party in possession is the better condition. The verdict of the jury was not, therefore, contrary to law. In our judgment, it was not contrary to evidence or the preponderance of the evidence. The defendant in the Court below, claims to have purchased the negroes, Matt and Billy Buck, on the 18th of February, 1848, and Martha on the 2d of September, 1851. His bills of sale are of these dates. It was insisted, in the argument before this Court, that there was a subsequent purchase of the slaves by Charles T. Beale. The plaintiff made out his title in the Court below, by proof by Dr. Martin, that defendant (plaintiff in error) said to him in 1850 or 1851, that

Buck belonged to the deceased; by Day, that the deceased had possession of the negroes when he left Columbia county, two or three years before his death; and by Christian, that he had bought Buck of deceased, on the Friday before his death, and he saw defendant in relation to the trade, who said there was no incumbrance on him; that he hoped he would not buy them, as they were family negroes, and if Gaz was bent on selling them, he would buy them himself; he did not deny the right of Gaz. to sell them, but said the title was in himself. The evidence of title on the part of the defendant was, that about eighteen months before the trial, which took place in October, 1856, he called on Dr. Campbell to treat the negroes for hernia. The bill of sale for the negro men was proven and read in evidence. No money was paid, nor notes given in the presence of the witnesses, but the bill of sale was handed to Gazaway Beale, who was to deliver it on receiving the notes, and he told one of the witnesses, two or three days afterwards, that he had received the notes. The bill of sale for Martha was proven and read in evidence. One of the witnesses testified to deceased's hand writing, and the other to the execution of the bill of sale, but neither of them proved the payment of any consideration. The only remaining evidence to this point, is the evidence of Simpson, that defendant had borrowed money from him to finish paying for two negroes, that the money was paid to the deceased, who said it was for the purchase of the negroes. The jury upon this testimony, had certainly a right to find, and no doubt did find, that the plaintiff had no right to hold the negroes, Matt and Buck, under the bill of sale executed in February, 1848. In 1850 or 1851, he told Dr. Martin that Buck was the property of Gaz. Beale, and when he paid him the note for the hire, he said he was his agent. He told Christian, on the Friday before his death, when he saw him respecting the trade he had made with Gaz. Beale for Buck, that there was no incumbrance on him. If Gaz. was bent on selling them, he said he would buy them himself. He

did not deny the right of Gaz. to sell them, but said the title was in himself. Roberts testified, that Gazaway Beale wanted to turn the negroes into money, and sold them to Charles T. Beale for that purpose, and yet no money was paid. The witnesses testify that notes were to be given, and that Gazaway Beale said he had received the notes. When Simpson saw the money borrowed from him, paid, no note was given up, and if his testimony applied to the sale of 1848, a note ought to have been given up. But it is evident from Charles T. Beale's admissions, that he claimed no right to the slaves under the bill of sale. Now, in regard to a second sale to be implied from Simpson's evidence, already stated, the jury had a right to draw their own conclusions. The same witness testifies, that he heard plaintiff in error say that Christian wanted to buy one of Gaz's boys. In this conversation he spoke of them as Gaz's boys, and said they were family negroes, and if they were sold, *he would* buy them himself. Now, this was a conversation held, the witness says, when he came to borrow the money to pay the balance due by defendant to deceased for the negroes. The jury were the proper judges of this evidence, and they did judge of it. It seems from the informal verdict first returned by them, that they considered that the plaintiff in error should be allowed the $500 paid as a part of the hire of the negroes. Dr. Martin had paid him hire, and Henry Dawson did the same thing.

In regard to Martha, the evidence is less complex. There was a bill of sale. A witness saw it executed, but he does not testify that he saw either a note given or the money paid, and yet he says, that he states all he knows in favor of the defendant. Whether he obtained the title to Martha in accomplishment of his expressed purpose to fix Gaz's property, and to secure it to his wife and children, the jury were the judges. He did not probably own Martha at the time that Matt and Buck were conveyed; for Richard B. Day testifies, that he knew Matt and Buck, and *afterwards* deceased had a woman named Martha. We regret that the ground taken

in the motion for a new trial, makes it necessary to go so fully into the consideration of the evidence. It was unavoidable. We concur with the Court below, that a new trial ought not be granted on this last ground, but reverse the judgment and order a new trial, on the grounds herein specified as errors in the decisions of the Court below.

Judgment reversed